aεε

**FILED**
JAN 1 0 2013
THOMAS G BRUTON
CLERK, U S DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Plaintiff
JUDITH MICKELSON, plaintiff                No. 1:11-CV-5061

v.

JEROME H. MICKELSON, and others, defendants


MOVE FOR SANCTION


Plaintiff moves the Court for the following:

Defendants filed for summary asking Court for oversized brief (granted) and supplied a large amount of "documents."

Plaintiff upon reviewing said documents now submits that many of the documents were "privileged" communications between plaintiff and former counsel to which former counsel has stated "he did not turn these over to defendant."

Plaintiff has also discovered that many of the documents were also never turned over to plaintiff as any discovery disclosures, preventing plaintiff from knowing of them.

Plaintiff has further discovered that "some" of the documents contained within defendants summary are actually fraudulently created documents not actually endorsed by plaintiff.

This is a serious matter plaintiff knows should not be simply "overlooked or ignored" by the tribunal.

Plaintiff asks the Court to determine "how: defendant obtained such documents and why such documents were not disclosed and why said documents are false.

Plaintiff asks for sanctions against defendant for such egregious conduct.

Plaintiff has attached a detailed listing of the documents within defendants summary in question.

JUDITH MICKELSON
1864 Mundy's Landing
Versailles, KY 40383
H: 859.879.7120

By: _____
JUDITH MICKELSON

CERTIFICATION

I certify that on 01/03/1213 this motion was served via first class US mail to:

Greg Shinall
55 W. Monroe Street, Ste 3200
Chicago, IL 60603

By: _____
JUDITH MICKELSON

answers_to_their_pleadings[1]

This is a list of my response to their pleadings, which they submitted on December 12, 2012.

1. TX 1 funeral and administrative expenses total $563,339. Check page 2 and page 3.

    Page 5 is the Lake house. The IRS charged more taxes on the Lake house, which probably came out of the family trust, even though my brothers made sure I was not a part of this house. Another example of how I was cheated out of money. I was even charged for the attorneys fees for the sale of this house. I am sure that the IRS agent for the audit, Walter London, did not know this.

    Page 6 is Quad JM. As a part of quad JM, I am sure that I am paying taxes on money that I cannot access or receive.

    Page 7 is Quad JM had to pay over $300,000 more in taxes, which of course comes out of my share.

    Page 8 is funeral, accounting, and attorneys fees which is over $500,000.

    Page 9 is Jerry getting $87,000 for the so-called "improvements" that he made for Mom at 1300 N. Lakeshore Dr., Chicago, IL.

3. TX 3 is a continuing Unconditional Guarantee for 8765 Mundy's Landing Corp. The initials are not in my father's handwriting and my father's signature on the back page of this document dated April 1, 1998 is questionable. These are on pages 12 and 14. Checked my father signature throughout these documents and you can see that this one doesn't match. And these documents span close to 20 years.

4. TX 4 is a promissory note to my father for $6500 dated May 29, 1991.

5. TX 5 are three promissory notes to my father. Two of the notes to 8765 Mundy's landing Corp.; one for $2396.30 and the other for $20,600. A third note is to Black Sheep stable for $15,375.61.

6. TX 6; page 21 does not say loan.
Page 22 does not say loan.
Page 23 lists 2 loans. It is important to note that at the time of those two loans I was ending a bad marriage and I'm sure my father helped me. That does not mean that all wire transfers and advances are loans.
Page 25 there are no loans after December 14, 1990 through July 31, 1992, which is page 26.

A.) 1 1/2 years, with no loans? Page 34, all Black Sheep advances are not loans.
Page 35; advances, wire transfers and one loan to 8765 on May 18, 1989.
Page 36; loans, advances, and wire transfers.
Page 37; advances and a loan.

B.) They are showing these "loans" twice!

C.) Page 38, 39, 40; Bubby's Farm is not me! See page 46.

D.) A letter to Dad

E.) Page 49 and 50 are repeated with two checks dated May 29, 1991. One for Black Sheep and the other for 8765.

F.) Page 51 and 56, memos from Dad that were mailed with the same request three times in 9 days!

G.) Promissory note for $20,057 with no date from 1989 on page 66.

Page 1

answers_to_their_pleadings[1]

7. TX 7 page 69 and 70, what did they charge me for legal fees? And the Renée letter to Gerald Mannix where Pete made 2 mortgage payments. Mom paid him back. That is what they wanted! I refused to sign any more "minutes" after 1998 because my father made sure my taxes were a mess. During the first meeting at Renée's office after my father's death in 2001 Renée said that she would make sure that the taxes for me would be straightened out. Renée guaranteed this, as they needed my signature on some documents. When I called Renée about my tax situation many months later from my accountant, Jean's, office; Renée's quote to me was "that is not my problem." 8765 is empty Corporation which did not generate any income.

Page 71; Jean could not prepare returns.

Page 72; more legal fees

A.) Renée's letter of February 13, 2002 about more foreclosure!
B.) Check the accounting: from $165,000 plus $19,000 plus $36,000 = $220,000 to $455,502.85. What legal fees?

9. TX 9; pages 76, 77, 78 is the John Grisham letter from 1998. Where did they get that?

12. TX 12; page 83 is an IRA rollover of my fathers worth $1.7 million. Page 84; shows that I am a co-trustee.

13. TX 13; page 86 is Bob Shadur's e-mail to me. Notice the two holes at the top, was this Lloyd's doing or David's?

14. TX 14; my e-mail to Renée questioning her fairness. Two holes in the top.

17. TX 17; with a David Locks e-mail header dated July 2, 2010 are my e-mails to and from Bob Shadur. Where did they get these?

18. TX 18; page 3 is Mom's rent, Quad JM investments and Triple JM.
 Page 4; please notice the management fees.
Page 5; according to their 2006 settlement agreement between my three brothers they received from triple JM a distribution of $15,000 dated June 15, 2006.
Page 6; Also on that same day, there was a distribution to the family trust, the marital exempt trusts, the marital non exempt trust, and Shirley's trust in the amount of $1,485,000. Compare the attorneys fees. On July 6, 2006 there was a distribution to the family trust, the marital exempt trust, the marital not exempt trust in the amount of $32,961.32.

29. TX 29; page 4 is the $125,000 distribution of which they charge me over $75,000 in legal fees. All three brothers got their entire $125,000. As usual, I did not. I did not agree to the $500,000 distribution that I was not going to receive. They took $500,000 from me anyways against a debt that they created.

30. TX 30; page 6 Greg's e-mail to Bob Shadur and Robin Omahana. Of course, they don't show Bob's response. Please note that both Bob and Robin refused to sign the acknowledgment of counsel.

31. TX 31; my fax to Jerry which he never answered. Please note two holes at the top of the page. Where did they come from?

33. TX 33; Declaration of Trust of  RRM. Page 23; 3.4 is I am a trustee of my own trust.
Page 31; 10.2 is the Division of Trusts which was never followed.

Page 33; 10.3 is Administration of Child's Nonexempt and Exempt Trust. Rarely were my fathers wishes followed.

Page 35; 11.1 is Definitions and Standards. The term "support" shall mean expenses for support in the beneficiaries accustomed manner of living, medical care and

answers_to_their_pleadings[1]

education (including college, postgraduate, professional, religious and trade school education). The term "best interests, comfortable support and welfare" shall mean not only expenses for support in the beneficiaries accustomed manner of living, medical care and education (including college, postgraduate, professional, religious and trade school education), but shall be liberally construed to include distributions for the beneficiaries confort and convenience (including, without limitation, distributions to permit the beneficiary to travel, to purchase or furnish a personal residence, and to purchase, initiate or invest in a business). My father never intended for me to be on food stamps and begging for my money for medicine, medical care, and to live.

Page 41; 11.21 is Co-trustees. I am a co-trustee of my own trust.

Page 42; 11.22 is Withdrawal of Principal. All rights to withdraw principal conferred by this instrument may be exercised only voluntarily by the beneficiary having such rights and may not be exercised by a legal representative, attorney in fact or others. Principal subject to withdrawal by beneficiary shall be paid to the beneficiary upon a written request signed by such beneficiary and stating that such withdrawal is voluntarily requested.

Page 48; Second Amendment of Declaration of Trust of RRM dated July 22, 1998.
2. I hereby amend section 10.3 a to delete the first (1st) sentence thereof and insert the following in its place: "The trustee shall pay the income of the child's trust in convenient installments, at least quarterly, to the child during the child's lifetime." That never happened to me.

34.TX 34; The Trust of Shirley Mickelson. Page 6; Article 8, Establishment of Family Trust.
Page 7; 9.02 is the Division of Trusts, which was never done.

Page 8; 9.03 a) payment of income and principal. The trustee shall pay the income of the child's trust in convenient installments, at least quarterly, to the child until complete distribution of the child's trusts or the child's prior death. The trustee shall also pay to the child such sums from the principal of the child's trust as the trustee deems necessary from time to time for the support of the child. It is my intent at the support of the child be given priority over conservation of principal. This was never done.

9.03 b) Withdrawal of Principal. I've never been allowed to withdraw anything.

Page 9; Article 10: Administrative Provisions. 10.01 is Definition of "Beneficiary" and "Support". Again, this never happened.

10.04; Assignment of and Claims Against Interest of Beneficiary. The interests of the beneficiary in income or principal shall not be subject to the claims of any creditor, any spouse for alimony or support, or others, or to legal process, and may not be voluntarily or involuntarily alienated or encumbered. This provision shall not limit the voluntary exercise of any power of withdrawal or appointment granted by this instrument. Here we see my brother acting as a creditor and taking all my money for his legal fees, which is against the wishes of my mother.

Page 15; 10.21 is Co-trustees. I am a co-trustee and have never been able to exercise my power as a co-trustee, which is guaranteed in my mother's declaration of trust.

10.22 withdrawal of principal. Again, this is the same situation where I have never been able to withdraw any money from my trust, which is guaranteed in this document under this heading.

Page 19; First Amendment of trust of SSM dated July 12, 1990
page 20; Division of Trusts. This division of trust was never followed as stated in my mother's document.
Page 21; 5 "(a) Payment of Income and Principal. This was supposed to happen at

Page 3

answers_to_their_pleadings[1]

least quarterly. My mother's wishes were never followed.
Page 21; 6. "(b) Withdrawal of Principal. Again, my mother's wishes were never followed.
Page 21; 7. "10.01 Definitions and Standards. "The term' support' shall mean expenses for support in the beneficiaries accustomed manner of living, medical care and education (including college, postgraduate, professional, religious and trade school education). The term' best interests, comfortable support and welfare' shall mean not only expenses for support in the beneficiaries accustomed manner of living, medical care and education (including college, postgraduate, professional, religious and trade school education), but shall be liberally construed to include distributions for the beneficiaries comfort and convenience (including, without limitation, distributions to permit the beneficiary to travel, to purchase or furnish a personal residence, and to purchase, initiate or invest in a business). My mother never intended for me to be on food stamps and begging for my money to live.

Page 24; Second Amendment Of Trust Of Shirley Mickelson dated December 16, 1991
page 25; 3.04 states that I am a co-trustee of the Exempt Trust and Nonexempt Trust created for me. I have never been able to exercise my powers as a trustee because of my brother Jerry's interference.

Page 27; 9.02 is Division of Trusts. This was never done in the time parameters set up by my mother and father.

Page 28; 9.03 is Administration of Child's Nonexempt and Exempt Trust.
A. Payment of Income and Principal. "The trustee shall pay any part or all of the income of the child's trust to the child as the trustee deems advisable from time to time for the support of the child, and shall accumulate and add to principal any income not so paid. The trustee shall also pay to the child such sums from the principal of the child's trust as the trustee deems advisable from time to time for the support of the child. It is my intent that the support of the child be given priority over conservation of principal. I am a trustee of my own trusts. My mother never meant for me to be on food stamps and begging for my money to live.

Page 30; 5. This is 10.01 Definitions and Standards. The term' support' shall mean expenses for support in the beneficiaries accustomed manner of living, medical care and education (including college, postgraduate, professional, religious and trade school education). The term' best interests, comfortable support and welfare' shall mean not only expenses for support in the beneficiaries accustomed manner of living, medical care and education (including college, postgraduate, professional, religious and trade school education), but shall be liberally construed to include distributions for the beneficiaries comfort and convenience (including, without limitation, distributions to permit the beneficiary to travel, to purchase or furnish a personal residence, and to purchase, initiate or invest in the business). My mother never intended for me to be on food stamps and not have my medication or needed medical care, or have furniture in my house or be able to travel. Time and again I have been denied access to my funds as guaranteed in both my mother and father's wills and trusts.

38. TX 38; 2003 Settlement Agreement
page 2; Article III Recitals
E. Bob made all of the monthly payments on the Bank Loan to the Bank during his lifetime and either the Estate or Shirley made a number of additional payments after Bob's death to the Bank on the Bank Loan. 8765 never made any payment, or reimbursed any payment made by Bob or the Estate, on the Bank Loan. This is not true I made number of payments and have a check to my father in the amount of $50,000. I was coerced to sign this agreement under threat of foreclosure and losing the farm, which I have lived and worked on since 1989. They've created debts for me and told me if I did not sign this 2003 settlement agreement they would take everything away from me. I told them I would never sign a power of attorney and an irrevocable proxy and yet they have included it anyways. I have personal notes from those meetings where I unequivocally state no power of attorney and no irrevocable proxy. Please note there is no signature of mine on this 2003 settlement agreement which they have submitted to the court. When they do show my signature, it is always by itself on a

answers_to_their_pleadings[1]
blank page which they then attach anywhere they want.

39. TX 39; Page 71 is an e-mail from Jon Mickelson to Jennifer Merlin dated May 7, 2001. This e-mail is fabricated. It says that it is written by my brother, Jon. But the phone number he gives for Jennifer to call him back is Jerry's private cell phone number. Also please note all the headers are incomplete on this e-mail, which could've never happened especially in 2001.

40. TX 40; letter from Joe Riddell on August 27, 2003 for new appraisal on the farm because I was under the threat of foreclosure.

42. TX 42; page 81 is a letter from Renée to Greg dated August 29, 2011 with a list of exhibits.
Page 83; f. "Further Expense Debt" means legal fees.

Page 85; check the last entry which says see folder 4, "Locks boxes". Is this how and where they got all their information from David Locks?

Page 87; this is a letter from Morrison and Morrison, the accountants. In it they state that "they were the preparer of the tax returns for Shirley Mickelson her estate in various trust returns and other entities since 2005. Prior to early 2006 we had never done any work for the family other than for Jerry Mickelson and his various entities." Which is it 2005 or 2006?

44. TX 44; This is a letter from Renée to my then attorney, Gerald Mannix, dated February 13, 2002. There is the threat of foreclosure on the third page of this letter. On the fourth page of this letter there is also the irrevocable proxy which I told them time and again I would never agree to. There is also another foreclosure note in the last paragraph.

47. TX 47; this is a letter from Renée to Gerald Mannix dated April 22, 2002. This is also another letter with the threat of foreclosure in it. There is another letter again from Renée to Gerald Mannix dated April 30, 2002 also with another threat of a May 9, 2002 deadline.

49. TX 49; these are voicemails between Renée and Gerald Mannix with my questions.

50. TX 50; page 8 is a letter from Renée dated April 30, 2002 wherein she lied about my fathers IRS returns.

51. TX 51; page 11 is a letter from Renée to Gerald Mannix dated May 9, 2002.
Page 12; e. The debts from Judy, 8765 Mundy's Landing Corp. and her affiliated entities or businesses have been included at face, but with doubtful collectibility noted, in the estate tax return as filed. This is just what Wendy reported in her accounting letter.

52. TX 52; page 14 is an e-mail from Renée to Jerry. Again, this shows more pressure all the time.

53. TX 53; page 16 is a letter from Renée to Gerald Mannix dated June 26, 2002 stating that 8765 had not been reinstated when in fact it had.

54. TX 54; this is a letter to Renée from me dated July 30, 2003 stating that Gerald Mannix had been terminated the year before. I enclosed a copy of that letter that dated July 19, 2002. I had no legal counsel for the 2003 settlement agreement, which happened late in August of 2003.

55. TX 55; page 25 is the conference call agenda dated August 4, 2003.
2) BASIC DEAL: carry the debts and eventually allocate to/set off against Judy share of Bob's trusts (after death or Shirley), but still need to protect estate/trust. Otherwise, executor/trustee has a duty to foreclose the mortgage and pursue collection of the debts to the extent reasonably possible.Please note the attorneys fees for all this.

Page 5

answers_to_their_pleadings[1]

3. e) I did not ever grant an irrevocable proxy of my shares.
h) close the probate estate. I've been asking and asking about this many times.

60. TX 60; page 27 is Jerry signing a promissory note in the name of the 8765 Mundy's Landing Corp. for $180,000 when he is not on the board of directors in 1998.

60. TX 60 A; page 29 is again Jerry signing as an officer of 8765 Mundy's Landing Corp., when in fact in 1998 he was not an officer of the Corporation.

60. TX 60 B; page 31 Jerry is not an officer of 8765 Mundy's Landing Corp. in 1998.

60. TX 60 C; page 33 Jerry is not an officer of the 8765 Mundy's Landing Corp. in 1998. This was nothing but a chokehold. This document wasn't written until August 8, 2003. It was not signed by me until much later in August possibly even September. We were always with my former husband's family in August because my brother-in-law's birthday was August 6 and there was always a big party.

60. TX 60 D; page 40 is again Jerry is not on the Board of Directors of 8765 Mundy's Landing Corp. in 1998.

61. TX 61 A; this is another $50,000 dated October 1, 2004. My then husband was in the hospital suffering from congestive heart failure and I did not know he didn't have any insurance. So to save his life, I had to borrow $50,000 from my end of the trust with the chokehold attached to it.

61. TX 61 B; this is another loan from my end of the trust for $25,000 dated January 22, 2007. At that time, I went to Louisiana to race my horses and get my business back in operation.

62. TX 62; page 54 is a promissory note for $5000 dated August 30, 2005. This loan with interest was for me staying up in Illinois to testify in my mother's court case for her health care. None of my brothers lost a dime. I'm the only one that had to pay and it cost me plenty. My friend Roger Oltman lent me $10,000 with no paperwork and no interest.

74. TX 74; page 17 is the many legal fees that they pay from my trust without my permission.
 page 20 is the US Treasury receiving money from my trusts without my signature or permission.